# UNITED STATES DISTRICT COURT

for the

District of Oregon

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with the cellular telephone assigned call number (541) 300-7207 that is stored at premises controlled by T-Mobile

Case No. 3:26-mc-00766

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

As described in Attachment A hereto

located in the Western District of Washington, there is now concealed *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, U.S.C. §§ 841(a)(1) and 846 | Distribution of a Controlled Substance and Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See affidavit which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Grant Taylor By Phone
*Applicant's signature*

Grant Taylor, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone at 3:40 pm *(specify reliable electronic means)*.

Date: July 30, 2026

Jolie A. Russo
*Judge's signature*

City and state: Portland, Oregon

Jolie A. Russo, United States Magistrate Judge
*Printed name and title*

DISTRICT OF OREGON, ss: AFFIDAVIT OF GRANT TAYLOR

**Affidavit in Support of an Application for a Search Warrant for a Cell Phone Account**

I, Grant Taylor, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1. I am a Special Agent with the Federal Bureau of Investigation and have been employed with the FBI since June of 2021. Since becoming a Special Agent, I have received specialized training from the FBI, to include completing the 21-week New Agent Training course at the FBI Academy in Quantico, Virginia. I am currently assigned to the Seattle Field Division at the Vancouver office where I am a member of the Columbia River Organized Crime Task Force. In this capacity, I investigate, inter alia, organized crime, drug trafficking, firearms offenses, and related violations. Based upon my training and experience, I am familiar with the methods criminals use to transport, market, and distribute illicit narcotics. I am also familiar with the means of communication criminals employ in pursuit of these objectives, as well as their methods of collecting proceeds and laundering funds. In my role as a Special Agent for the FBI, I have participated in many aspects of investigations, including conducting physical surveillance, managing confidential sources, interviewing witnesses, conducting controlled buys of illicit narcotics and firearms, and executing search warrants. I am an investigative law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for, violations enumerated in Title 18, United States Code, Section 2516.

2. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call numbers identified below:

- **(541) 300-7207, with International Mobile Subscriber Identity 310260402765177**

The number is hereinafter referred to as the "the SUBJECT PHONE". The information is stored at premises controlled by T-Mobile USA, Inc. (hereinafter, Provider), a wireless telephone provider headquartered at 12920 SE 38th Street, Bellevue, WA 98006. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that Reynalda HERRERA-HUERTA (HERRERA) has violated Title 21, U.S.C. § 841(a)(1), Possession with Intent to Distribute and Distribution of a Controlled Substance; and Title 21,

U.S.C. § 846, Conspiracy to Distribute Controlled Substances. There is also probable cause to search the information described in Attachment A for evidence and instrumentalities of these crimes as further described in Attachment B.

**Target Offense**

5. I believe there is probable cause to believe that evidence of the following violations will be found in the places to be searched:

- Title 21, U.S.C. § 841(a)(1), Distribution of a Controlled Substance, which makes it unlawful to distribute or possess with the intent to distribute controlled substances; and
- Title 21, U.S.C. § 846, Conspiracy to Distribute Controlled Substances, makes it unlawful to conspire to distribute or possess with intent to distribute controlled substances in violation of Title 21 U.S.C. § 841(a)(1).

**Relevant Electronic and Wire Communication Statutes**

6. The relevant federal statutes involved in the disclosure of customer communication records for the requested data in the Account are as follows:

a. 18 U.S.C. § 2703(a) provides, in part: "A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court of competent jurisdiction."

b. 18 U.S.C. § 2703(b)(1) provides, in part: "A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic

communication . . . (A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court of competent jurisdiction."

c. 18 U.S.C. § 2703(c)(1) provides, in part: "A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity—(A) obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court of competent jurisdiction."

d. 18 U.S.C. § 2510(1) defines a "wire communication" as "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce."

e. 18 U.S.C. § 2510(12) defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce," with certain exceptions not applicable here.

f. 18 U.S.C. § 2510(17) defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic

transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication."

g. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A), and 2711. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

**Statement of Probable Cause**

7. In the fall of 2025, investigators[1] received reporting from a Confidential Human Source (CHS-1). CHS-1 began cooperating with the government for potential sentencing consideration on state charges. CHS-1 has an extensive criminal history that includes multiple misdemeanor and felony convictions, including for: Burglary in 2007; Unlawful Imprisonment, Assault, Interference with Reporting Domestic Violence, Residential Burglary, and Resisting Arrest in 2013; Manufacture, Delivery, and Possession with Intent to Distribute Marijuana in 2016; and a Community Custody Violation in 2019. CHS-1 has provided accurate and verified information to law enforcement in the past.

8. Investigators also received reporting from a second CHS (CHS-2). CHS-2 also has an extensive criminal history with numerous drug-related felonies. Additionally, CHS-2 has prior convictions for Burglary, Theft, and Criminal Mischief. CHS-2 began cooperating for potential sentencing consideration on state charges. CHS-2 has provided accurate information

[1] When I use the term "investigators" throughout this affidavit, I am referring to law enforcement personnel, including but not limited to FBI special agents, task force officers, other law enforcement agents, and local law enforcement sergeants, detectives, officers, and deputies.

that has been verified by law enforcement. However, on November 12, 2025, I became aware of information that CHS-2 was recently involved in unauthorized and illegal drug trafficking activity. Additionally, in March of 2026, I became aware that CHS-2 had died from an overdose. The information relied on herein from CHS-2 was obtained before I received this information regarding unauthorized drug trafficking.

9. CHS-1 reported that JOSE Last Name Unknown (LNU) was using phone number XXX-XXX-6225 (Target Telephone 1, or TT-1) in order to coordinate deliveries of distributable amounts of drugs. JOSE was selling methamphetamine for $1,250 per pound and fentanyl powder for $800 per ounce. These prices would drop if the order was for over ten pounds of methamphetamine or over five ounces of fentanyl powder. JOSE had runners near the Eugene, Oregon, area who would make deliveries in Albany, Salem, and Portland.

10. Investigators discovered that TT-1 was a number that was a Voice Over Internet Protocol (VOIP) line serviced by TextNow Inc. On October 3, 2025, investigators served TextNow with an administrative subpoena for TT-1. IP logs showed that TT-1 had been using IP addresses that return to locations in Mexico.

11. Based on my training and experience, I know that Mexican drug trafficking organizations often consist of narcotics dispatchers who reside in Mexico to escape law enforcement pressure. I know that these dispatchers typically set up cells in the United States to distribute narcotics to their customers and collect money on their behalf. These cells often consist of several runners, a logistics coordinator for necessities such as cars and residences, and a local boss to oversee the operation. I also know that dispatchers use separate lines of communication for their subordinates and for their customers. I believe TT-1 is the customer line

for the organization. I also know that drug traffickers use VOIP services such as TextNow to be able to rapidly change numbers and limit the amount of information available at first glance to law enforcement.

**Controlled Purchase #1**

12. In October 2025, investigators conducted a controlled purchase of methamphetamine and fentanyl by coordinating with JOSE. Investigators met with CHS-1 at a staging location and searched CHS-1's person and vehicle. No contraband was found. Investigators then provided CHS-1 with a quantity of US currency for the purchase of methamphetamine and fentanyl powder as well as an audio/video recorder which also provided live monitoring. CHS-1 texted TT-1 and was directed to drive to a location. CHS-1 drove to the location provided by JOSE while investigators maintained physical surveillance. CHS-1 parked next to a black BMW sedan with no license plate and entered the BMW.

13. The BMW was occupied by a male and a female. On the recording, the voices could be heard discussing prices for "crystal" and "fetty" with CHS-1. Based on my training and experience, I know that "crystal" is the street name for methamphetamine and "fetty" is the street name for fentanyl. The female stated the price for both, and then the male made a phone call in Spanish. CHS-1 reported that the phone call was made via WhatsApp. In the phone call, the male said that he was making the delivery and asked for confirmation of prices. Based on my training and experience, I know that dispatchers determine the prices they give their customers. I believe the male runner called JOSE to receive direction on what the final price was for CHS-1. Once the prices were confirmed by the individual on the other end of the phone call, CHS-1 made the purchase of the methamphetamine and the fentanyl and returned to CHS-1's vehicle. CHS-1 later

reported that when the runners retrieved the methamphetamine, they accessed the trunk where multiple other gallon sized bags of methamphetamine were visible. Investigators attempted to follow CHS-1 away from the buy location but were separated for a period of approximately 8 minutes. The live monitoring/recording device was on for the entirety of this time and no unusual activity or meetings with other individuals were detected.

14. Investigators regained surveillance on CHS-1 and followed CHS-1 to the staging location. Investigators retrieved a gallon sized bag of what appeared to be methamphetamine and a small, sealed baggie of what appeared to be fentanyl powder. The suspected drugs were transported back to the Clark County Sheriff's Office (CCSO) Special Investigations Unit (SIU) where they were weighed and stored overnight. Investigators transported the drugs to the Vancouver Resident Agency of the FBI the following day. The suspected methamphetamine was weighed and field tested, returning a positive indication for methamphetamine. The total packaged weight of the methamphetamine was found to be 487.8 grams, and the total packaged weight of the suspected fentanyl powder was found to be 61.6 grams.

**Identification of Jose's Runners**

15. CHS-2 provided information that JOSE's runners would be located at a hotel at a certain time. Investigators went to the hotel and set up surveillance. Investigators observed a black BMW with a temporary tag but no plates. Shortly thereafter, investigators observed a woman dressed in a pink hoodie retrieve items from the black BMW and walk to a silver Chevrolet Impala with Oregon temporary tag 1212973. The woman placed the items in the Impala and then made several more trips between the two vehicles. A younger adult male joined the woman and made several trips between the BMW and the Chevrolet Impala.

16. Investigators requested records for the Impala and received returns showing that the car was registered to Reynalda HERRERA Huerta, at an address in Springfield, Oregon. A driver's license picture for HERRERA matched the woman seen walking back and forth between the two vehicles. Investigators requested a list of vehicles registered to HERRERA. The list provided a 1997 Toyota Camry owned by both HERRERA and an individual named Carlos Javier CALVILLO. CALVILLO's driver's license picture also appeared to match the adult male seen with HERRERA moving between the BMW and the Impala, and CALVILLO's address was also listed as the same address in Springfield, Oregon. Investigators showed CHS-1 pictures of HERRERA and CALVILLO. CHS-1 confirmed HERRERA and CALVILLO were the male and female that CHS-1 bought methamphetamine and fentanyl from during Controlled Buy #1. It was later determined that CALVILLO arrived in the United States after the date of Controlled Buy #1. CALVILLO has a younger brother who looks very similar to CALVILLO.

17. Investigators searched public records for phone numbers associated with HERRERA and found phone number 541-728-4088. Phone number 541-728-4088 (TT-2) is a number serviced by T-Mobile, and was listed as a possible match for HERRERA's phone. Investigators served an administrative subpoena to T-Mobile for TT-2. The subscriber was listed as Reynalda HERRERA Huerta at the same Springfield, Oregon address. The number was listed as active since April 25, 2025.

**Controlled Purchase #2**

18. In early November, investigators conducted another controlled purchase from JOSE. Investigators again met with CHS-1 at a staging location prior to the buy. Investigators searched CHS-1's person and vehicle and no contraband was found. Investigators then provided

CHS-1 with a quantity of US currency for the purchase of narcotics as well as an audio/video recording device which also provided live monitoring. CHS-1 was given a meeting location by JOSE and drove there, followed by investigators. While en route, technical issues required investigators to restart the recording device. The device did not monitor a period of approximately ten minutes but restarted just before the CHS met with the runners. A gray BMW with no plates and what appeared to be a temporary tag in the rear window parked next to the CHS's vehicle. CHS-1 entered the BMW and met again with a male and female. CHS-1 reported they were the same two from Controlled Purchase #1, who investigators believed were HERRERA and CALVILLO.

19. CHS-1 made the purchase and returned to the staging area, followed by investigators. Investigators retrieved what appeared to be methamphetamine in gallon bags and a small sealed black pouch. The suspected methamphetamine was weighed and field tested, returning a positive indication for methamphetamine.

**Geolocation Warrant for TT-2**

20. On November 5, 2025, a geolocation warrant for TT-2 was signed in the District of Oregon. This warrant was served to T-Mobile on November 6, 2025, and also included historical location data for TT-2. Investigators looking through the data observed that pings for the phone appeared to track down to California on October 30, 2025. They appeared to return to the Springfield area on October 31, 2025. Based on my training and experience, I know that the Los Angeles area is a hot spot for drug trafficking activity. I know that dealers in markets further from the border often make trips to the Los Angeles area in order to pick up narcotics and transport them back to their area of operations. These trips are often done via car and take place

over a very short period of time. Given that Controlled Purchase #2 was done shortly after this trip, I believe TT-2's trip to Los Angeles was done for the purpose of resupplying CALVILLO and HERRERA.

21. Investigators monitoring geolocation pings for TT-2 observed the phone travel to Salem and Portland at night several times, consistent with known patterns of HERRERA and CALVILLO. On the morning of November 11, 2025, investigators saw that the phone was again traveling south along I-5. TT-2 had left Springfield, Oregon, at approximately 2:30 AM. The phone eventually stopped just outside of Los Angeles in Santa Monica, California, on the afternoon of November 11, 2025. The pings for TT-2 were in the area of FOUND Hotel Santa Monica.

**Investigators Identify Subject Vehicle**

22. Investigators served an administrative subpoena to FOUND Hotel and found that CALVILLO had rented a room at the hotel. CALVILLO listed his phone number as 541-728-4088 (TT-2) and his vehicle as a gray Chevrolet with California license plate XXXXXXX. Investigators ran the license plate and discovered that it was a rental car from Hertz Car Rental. This car was a 2025 Chevrolet. The license plate returns did not specify what model the vehicle is but did provide that it is a "Body Type Model (BTM) 4 High," meaning it is a four-wheel drive vehicle such as a pickup or other multipurpose vehicle.

23. On the morning of November 12, 2025, investigators saw the pings for TT-2 heading east out of Los Angeles. The pings went to a rest stop outside of Palm Springs and stayed there for approximately two hours. TT-2 did not continue east from the rest stop. It appears that the rest stop was the intended destination. TT-2 then returned to the area of FOUND

Hotel in Santa Monica. Based on my training and experience, I know that people do not often choose rest stops as final destinations for long trips. Such stops are often used for meetings or exchanges. I know that drug dealers often conduct such meetings in remote areas to conduct exchanges of money or drugs.

24. On the evening of November 12, 2025, investigators saw the pings for TT-2 head north. Upon leaving the area of Los Angeles, the pings tracked along I-5, continuing at regular intervals throughout the night. Investigators drove to the Medford, Oregon, area and set up surveillance along I-5.

**November 13, 2025, Seizure of Methamphetamine and Fentanyl**

25. On November 13, 2025, investigators obtained an anticipatory federal search warrant for the Subject Vehicle and CALVILLO's person. These warrants were to be executed when CALVILLO and his rental vehicle (the Subject Vehicle) reentered the District of Oregon. The warrants were signed by the Honorable United States Magistrate Judge Youlee Yim You.

26. Investigators observed the pings enter an area of Medford, Oregon and they began driving among the cars on I-5. Investigators located the Subject Vehicle, which was found to be a gray Chevrolet Trax SUV bearing California license plate XXXXXXX. Investigators followed the Subject Vehicle to a rest stop, where they observed two males, a female, and a child exit the car. The occupants reentered the Subject Vehicle and continued north followed by investigators.

27. At approximately 11:10 AM near Roseburg, Douglas County, Oregon, an Oregon State Patrol (OSP) trooper initiated a traffic stop on the Subject Vehicle for speeding. The trooper identified the driver as CALVILLO. The trooper received consent from CALVILLO to

search the Subject Vehicle, and CALVILLO signed a consent form. Investigators then asked the occupants of the Subject Vehicle to step outside the car while the car was searched.

28. In the trunk of the Subject Vehicle, investigators found a large black duffel bag filled with 24 large saran-wrapped bundles with what appeared to be blue laundry detergent inside. Each appeared to be about the size and weight of a kilogram of methamphetamine. Based on my training and experience, I know that this is a common packaging technique for methamphetamine. The laundry detergent is used to help hide the odor of drugs from drug-sniffing dogs.

29. Investigators also found a large laundry bag full of four sealed and wrapped brick sized objects with different color wrapping and writing on the outside. Based on my training and experience, I know that fentanyl powder is often packaged like this, with the colors and writing denoting different sources and mixtures of the drug. Based on the previous controlled purchases from CALVILLO of methamphetamine and suspected fentanyl, I believe this is what he was transporting back to his area of operation.

30. During the traffic stop, HERRERA arrived at the location alongside the I-5 Freeway and inquired about the stop and her son, CALVILLO.

31. Investigators transported the seized evidence items back to the Clark County Sheriff's Office (CCSO) Special Investigations Unit (SIU) office. There the suspected methamphetamine was field tested with a TruNarc machine. The field test returned a positive indication for methamphetamine. Based on previous issues with TruNarc detecting fentanyl, the suspected fentanyl was not field tested. The methamphetamine was weighed and found to have a total weight of approximately 25,013 grams before being packaged and sealed as evidence. The

suspected fentanyl was weighed and found to have a total weight of approximately 4,579 grams before being packaged and sealed as evidence. I know from my training and experience that approximately 25,013 grams is a distribution quantity of methamphetamine

32. A photo of the narcotics seized from the Subject Vehicle can be found below:




33. CALVILLO's cellphone was seized from the Subject Vehicle. CALVILLO was placed under arrest and read his *Miranda* rights. He did not provide an interview to law enforcement. The remaining occupants of the Subject Vehicle were released

34. After the traffic stop and arrest of CALVILLO, investigators reviewed CALVILLO's phone pursuant to the anticipatory federal search warrant for the Subject Vehicle

and CALVILLO's person. The phone was reviewed and translated by an investigator who was tested by the FBI and received a score deemed competent for translations. CALVILLO had an app called Threema which was used to communicate with an individual listed as "Hugo Boss." Based on my training and experience, I know that Threema is an encrypted communications application based in Switzerland. I know that criminals often employ encrypted messaging applications to avoid discovery by law enforcement. In the chats with "Hugo Boss," CALVILLO, using the screen name "Black," says the following on October 29, 2025[2]:

Black: Hey I downloaded the application. I'm the water lady's son.

Black: Call me when you can.

35. Based on my training and experience, I know that the term "water" is the street name for methamphetamine. CALVILLO is HERRERA's son. Therefore, I believe that CALVILLO is identifying his mother, HERRERA, as a supplier of methamphetamine who is known to "Hugo Boss."

36. Also found on the phone were WhatsApp messages with an individual listed as "Mom." The phone number for this individual was XXX-XXX-7207 (the SUBJECT PHONE). Investigators issued an administrative subpoena to T-Mobile for this number and found it to be registered to Reynalda HERRERA-Huerta at the same previously identified address in Springfield, Oregon. CALVILLO's screen name was "JavisszZ." In one set of messages, "Mom" sent two pictures of a black BMW sedan with no plates. The BMW does not appear to have

[2] The time on the messages lists it as around 2:07 AM UTC on October 30, 2026, meaning the chat would have taken place on October 29, 2026 PST.

plates. Of note, a black BMW sedan with no plates was used by the couriers during the first controlled buy. Below are the responses:

JavisszZ: It's cool I like it

Mom: Well when you arrive you'll help me

37. In later messages, "Mom" sent a picture of a large pile of United States Currency laid out on a bed. Below are the responses:

Mom: Look at my work

Mom: (Emoji)

Mom: I have to count all that

JavisszZ: No kidding that's a ton but quick with the machine

38. Further messages on WhatsApp between "JavisszZ" and "Mom" on November 9, 2025, appear to show "Mom" forwarding instructions for CALVILLO related to drug trafficking. The messages are below:

Mom: (forwarded message) Thanks see if the bigger (or older) one can bring down the paper and bring up some 3 bricks this time please. Because the water would be for next week probably.

JavisszZ: For when

Mom: Let me see what he says I think for tomorrow

39. Based on my training and experience, I know that water is the street name for methamphetamine. I also know that "bricks" are typically references to cocaine or fentanyl powder. I believe this message from "Mom" is HERRERA passing along instructions for CALVILLO to bring bulk currency and exchange it for narcotics.

**Records Held by Provider**

40. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

41. Based on my training and experience, I know that T-Mobile can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. Furthermore, a preservation request was sent on July 28, 2026, to T-Mobile for information pertaining to the SUBJECT PHONE.

42. Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of

business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

**Conclusion**

43. Based on the foregoing, I have probable cause to believe, and I do believe, that Reynalda HERRERA-Huerta has committed, is committing, and will be committing the Target Offenses and that evidence of that/those offense(s), as more fully described in Attachment B hereto, are presently contained in the Account, which is more fully described above and in Attachment A hereto. I therefore request that the Court issue a warrant authorizing a search of the Account described in Attachment A for the items listed in Attachment B and the examination and seizure of any such items found. The government will execute this warrant by serving the warrant on the Provider. Because the warrant will be served on the Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

44. Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Assistant United States

Attorney (AUSA) Steve Chamberlin. AUSA Chamberlin advised me it is AUSA Chamberlin's opinion that the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

*By phone pursuant to Fed. R. Crim. P. 4.1*
GRANT TAYLOR
Special Agent, FBI

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 3:40 pm on July 30, 2026.

Jolie A. Russo
HONORABLE JOLIE A. RUSSO
United States Magistrate Judge

**ATTACHMENT A**

**Place to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call number (541) 300-7207, with International Mobile Subscriber Identity 310260402765177 (“the Account”), that are stored at premises controlled by T-Mobile USA, Inc. (“the Provider”), headquartered at 12920 SE 38th Street, Bellevue, WA 98006.

# ATTACHMENT B

## Particular Things to Be Seized

### I. Information to Be Disclosed by T-Mobile (hereinafter "Provider")

1. To the extent that information associated with (541) 300-7207, with International Mobile Subscriber Identity 310260402765177 (hereinafter "Account"), is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on July 28, 2026, the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period October 1, 2025 to November 30, 2025:

a. The following information about the customers or subscribers of the Account:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to the Account, including:

1. Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; usernames; and source and destination Internet Protocol addresses;

2. Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers); and

3. All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Account.

4. All historical geo-location services/global positioning system (GPS) data/enhanced 911 (E911) records including any available ranging data [distance from tower, range to tower (PCMD/RTT/REVEAL/Historic MLTs, TrueCall, TDOA or Timing Advance Information or other similar

un-named records held by the Provider)] which may be available to the Provider.

**II. Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence, fruits, and instrumentalities of violations of Title 21, U.S.C. § 841(a)(1), Distribution of a Controlled Substance, and Title 21, U.S.C. § 846, Conspiracy to Distribute Controlled Substances for the time period of October 1, 2025, to November 30, 2025, for the Account(s) listed in Attachment A.